Filed 7/30/26  In re A.C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.C. et al., | B346144 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 24CMJP00087) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| N.C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Ashley Price, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Bryan Mercke, Deputy County Counsel, for Plaintiff and Respondent.

Father N.C. appeals from the juvenile court's disposition order denying him reunification services with his infant twin daughters, Ai. and Ad., pursuant to Welfare and Institutions Code section 361.5, subdivision (b).[1]  He argues that the court abused its discretion by concluding that reunification services would not prevent future abuse and that it was not in the children's best interest to provide him services.  He also asserts that the Los Angeles County Department of Children and Family Services (DCFS) did not comply with its inquiry duties under the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).  We affirm the court's disposition findings.  We decline to reach father's challenge to the adequacy of the ICWA inquiry as that issue is not ripe for review.

BACKGROUND

I.    *Referral and Petition*

Father and mother, M.R., are parents to twins Ai. and Ad., born in August 2024.  At the time of the initial incident in October 2024, mother and father were living together with the twins and mother's eight-year-old daughter, Al.[2]

On October 19, 2024, father was home alone with the twins when Ai. went into cardiac arrest.  Responding paramedics revived her after 10 minutes of CPR.  Ai. was hospitalized with severe injuries including a skull fracture, ischemic brain injury, multiple areas of bruising, retinal hemorrhages, and multiple brain bleeds.  Ad. was also evaluated at the

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    Al. is not at issue in this appeal.  Neither mother nor Al.'s father are parties to the appeal.

2

hospital given the extent and severity of Ai.'s injuries; Ad.'s CT scan showed no injuries.

Mother told DCFS that she had left the twins alone in father's care only a handful of times since their birth. She was on her way home from running errands when father called and said that Ai. was not breathing. Father told mother he had been feeding Ai., went to burp her, and she stopped breathing and became unconscious. Father was adamant with DCFS and medical staff that he did not cause Ai.'s injuries and did not know how they occurred. Father asked the doctor whether Ai. could have hit her head because she "moves a lot."

One of Ai.'s doctors, a child abuse specialist, told DCFS that the medical team suspected the injury was likely caused by non-accidental trauma. She also stated that the force needed to cause the injuries was "significant." The doctors opined that Ai.'s injuries appeared to have occurred within the last 24 hours.

Ai. was hospitalized for eight days due to her injuries. She underwent surgery and required a shunt placed from her brain to her stomach to prevent additional cranial swelling. Doctors stated that Ai. might need the shunt for up to one year.

DCFS filed a dependency petition on behalf of the twins under section 300, subdivisions (a), (b)(1), (e) and (j). The petition alleged that Ai. suffered severe injuries requiring lifesaving treatment and hospitalization, that her injuries were consistent with non-accidental trauma and were inconsistent with father's explanation of events. As such, father's physical abuse of Ai. placed her and her twin sister Ad. at risk of serious harm.

In November 2024, the court detained the children from father but released them to mother's care. Father was allowed monitored visitation.

On December 1, 2024, Al. reported that father had come to mother's home earlier that morning. After he and mother began arguing, mother took father's phone and locked herself in the bathroom. Father forced his way in by breaking down the bathroom door and then choked mother in the children's presence. Al. said she was not hurt during the incident but was scared and afraid that father would harm them. Father left with the twins but returned them later that day. Al. told DCFS that father became frustrated when Ai. and Ad. cry and "gets aggressive" with the children.

Al. also reported an earlier incident in November 2024, when mother woke her and the twins at 4:00 a.m. and drove with them to a hotel to confront father about an affair. Mother and father argued, then as mother tried to drive away, father jumped on top of mother's car while it was moving and the children were in the vehicle.[3]

DCFS filed a first amended petition on December 31, 2024. The petition added allegations regarding the two recent domestic violence incidents between mother and father.

II. *Jurisdiction and Disposition*

A social worker met with Al. in mother's home on January 8, 2025. Al. stated she did not feel safe in the home because she thought father would come and choke mother. She confirmed the details of her report regarding the incident with father choking mother and stated that she saw it happen, while father, mother, and the twins were in mother's bedroom. She also confirmed that father broke down the bathroom door during the same incident. However, Al. denied that father was aggressive and frustrated

---

[3] These incidents were first reported to DCFS by Al.'s father, who relayed what Al. had told him.

when the twins cried, stating she did not know how he acted around the babies.

Al. also confirmed the prior hotel incident in November 2024. She told DCFS that father threw himself on mother's car when she tried to leave. Father also got into his car and followed them, hitting the back of mother's car with his car "'a few times.'" Al. was scared during the incident but neither she nor her sisters were injured.

In January 2025, the court ordered the children removed from mother. The court pointed to evidence that both parents had violated court orders just a few days after the twins were removed from father and engaged in "very serious incidents that place these children at risk." The court rejected mother's contention that Al. was coached by her father to make the domestic violence allegations, finding Al.'s statements consistent and detailed. The twins were placed in the care of paternal grandmother.

Father was arrested on March 7, 2025 for his abuse of Ai. In an interview with law enforcement, father admitted that he shook Ai. twice, one to two minutes each time, and threw her onto the bed. The juvenile court adjusted father's monitored visitation to be consistent with the criminal protective order entered against him.

In April 2025, DCFS provided a letter from Dr. Adrienne Schlatter, a child abuse pediatrician. Dr. Schlatter had treated Ai. and diagnosed her with abusive head trauma, which she described as "brain and head injury secondary to forceful and violent shaking or impact of a baby's head." She opined that father's description of shaking Ai. and throwing her onto the bed was consistent with her injuries. She also noted that without medical attention, Ai.'s injuries "likely would have resulted in death." Ai. had required follow up care with neurology, neurosurgery, physical therapy,

5

occupational therapy, and the child abuse team. Ai. was readmitted in November 2025 because she was having seizures and continued enlargement of her subdural hemorrhage, and she was put on seizure medication. She had decreased use of the left side of her body and was receiving in-home therapy for developmental delays.

In April 2025, father completed a 12-week parenting course. His certification letter stated that he was an active, engaged participant.

At the April 14, 2025 jurisdiction hearing, the court sustained the allegations of physical abuse of Ai., including severe physical abuse under section 300, subdivision (e) based on the severity of Ai.'s injuries. The court also sustained the allegations of domestic violence between father and mother. The court continued disposition to the following month.

In an interview on May 6, 2025, father told DCFS what he had learned from his parenting course, including how to be a "better co-parent" with mother, how to have more patience, and new coping skills. Father stated he was "willing to do whatever I need to do in order to be with my children and be a family again."

Father visited the twins twice per week. Their caregivers, paternal grandparents, told DCFS that they no longer wanted to have monitored visits in their home. They were disappointed that mother and father were still dating and felt that the parents did not understand the severity of the DCFS case.

DCFS monitored several visits with father and the twins in April and May 2025 and observed that father was attentive and playful with the children. Father was appropriate during the visit and the twins appeared happy and comfortable.

DCFS expressed the belief that reunification would not likely be successful in preventing further abuse from father, citing Ai.'s tender age, the severity of her injuries, and father's initial denial of his conduct. DCFS opined that although he had engaged in a parenting program and was consistently visiting, it appeared that he "has not grasped the severity of the injuries nor has he shown remorse." DCFS thus recommended no reunification services for father.

At the disposition hearing on May 12, 2025, father's counsel argued that reunification would be in the children's best interest and that services were likely to prevent further abuse, citing father's appropriate visitation over several months, his completion of parenting classes, and his insight into what he had learned. He acknowledged the court's prior finding of domestic violence but argued there had been no new allegations since that time.

Counsel for the children noted father had eventually admitted that he had shaken Ai. twice for multiple minutes and that the child had suffered physical and emotional trauma as a result of his actions. She argued it was unlikely father would be able to safely reunify within a year without supervision, given father's reaction in anger toward his infant and then failure to take ownership of it. She also pointed to father's subsequent conduct in ignoring court orders and violence toward mother in the children's presence. Counsel for DCFS agreed, arguing father had shown a pattern of lack of impulse control and proper decision making that risked harm to the children.

The court stated it was "fully adopting" the argument by counsel for the twins and DCFS. The court observed that father, while watching the twins, had become so angry that he shook Ai. twice, almost killing her. Then, a few weeks later, he engaged in a "very serious domestic violence incident" with

mother, involving the twins in a vehicle with mother in the middle of the night "wherein either [the] cars were ramming each other or [father] was throwing himself on to the vehicle with the children present." The following month, father choked mother and took the children, against the court's orders, "including this very tiny baby that still had a shunt in her head from the injuries that father inflicted upon her in October, so the court has three extremely violent and extremely serious incidents that occurred back to back during the pendency of this case, so the court does not believe that the initial shaking was sort of a one-time, new parent being overwhelmed type of a situation." The court found father's "pattern of violence" directly placed the twins at risk of harm. The court also noted concern about the level of insight "that, frankly, either parent has as to the severity of these injuries," and found that Ai. would have "significant and long lasting impairments because of the choices that [father] made." The court found that DCFS had met the requirements of the bypass provisions and did not find by clear and convincing evidence that father met his burden to show it was in the children's best interest to reunify with him. The court therefore denied reunification services for father.

III. *ICWA Inquiry*

Mother and father completed Parental Notification of Indian Status (ICWA-020) forms prior to the detention hearing. They both indicated they had no reason to believe the twins had Native American ancestry.

At the November 2024 detention hearing, the court questioned multiple paternal relatives present, including great grandmother, grandparents, an aunt, and a cousin. Each individual denied knowledge of any Native American ancestry in the family. The court found the matter was not governed by ICWA, but reminded DCFS "of its ongoing obligation to

8

interview all known living relatives and provide an update in the next report."

In an interview with DCFS in December 2024, mother again denied Native American heritage. She stated that her parents were from Mexico and provided their names. Mother also told DCFS she had eight siblings. At a hearing in January 2025, the court again conducted an ICWA inquiry of the paternal relatives present, none of whom identified any potential Native American ancestry. There is no indication in the record that DCFS inquired of maternal grandparents or any other maternal relatives regarding Native American heritage.

Father appealed from the court's jurisdiction and disposition orders.

DISCUSSION

I.     *Denial of Reunification Services*

     A.     *Legal Principles*

When a child is removed from a parent's custody, the juvenile court generally is required to offer family reunification services to the parent. (§ 361.5, subd. (a); see *In re Ethan C.* (2012) 54 Cal.4th 610, 626.) Section 361.5, however, also contains several "'bypass provisions'" that permit the court to deny a parent reunification services under certain enumerated circumstances. (*In re Christopher L.* (2022) 12 Cal.5th 1063, 1078; see § 361.5, subds. (b), (e)(1).) The court must find that a bypass provision applies by clear and convincing evidence. (See *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 455 (*J.J.*).)

At issue here are two bypass provisions, section 361.5, subdivisions (b)(5) and (b)(6). Section 361.5, subdivision (b)(5) provides that a juvenile court need not provide reunification services where a child was brought within the court's jurisdiction pursuant to section 300, subdivision (e), which

9

involves severe physical abuse by a parent of a child under five years of age. If the court makes a finding that this subdivision is true, denial of reunification services is mandatory unless the court "finds that, based on competent evidence, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c)(3).)

Section 361.5, subdivision (b)(6) applies if (1) "the child has been adjudicated a dependent ... as a result of ... severe physical harm to the child, a sibling, or a half sibling by a parent or guardian," and (2) "the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." (§ 361.5, subd. (b)(6)(A).) If that bypass provision applies, then the court "shall not order" reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).)

DCFS bears the initial burden to establish the applicability of a bypass provision. (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141; see also *In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1272 (*Jayden M.*).) If DCFS carries this burden, "the burden shifts to the parent to prove that it is in the child's best interest for the juvenile court to exercise its discretion to provide reunification services in this case." (*Jayden M., supra*, 93 Cal.App.5th at p. 1272.) "In exercising this discretion, the court may consider a variety of factors relevant to the child's best interest, including (1) the parent's 'current efforts and fitness,' (2) the parent's 'history,' (3) the 'gravity of the problem' that led to the assertion of dependency, (4) the 'strength of the bonds' between the child and the parent and between the child and the current caregiver, and (5) the 'child's need for stability and continuity.'" (*Id.* at pp.

1272–1273, quoting *In re G.L.* (2014) 222 Cal.App.4th 1153, 1164.) Additionally, "[o]ne factor that is essential—and hence necessary—to the assessment of a child's best interest is whether there is 'some "reasonable basis to conclude"' that reunification is possible; if it is not, offering reunification services that are destined to fail is not in the child's best interest." (*Jayden M., supra*, 93 Cal.App.5th at p. 1273.)

We review a juvenile court's determination that DCFS has carried its initial burden in the first step for substantial evidence. (*J.J., supra*, 81 Cal.App.5th at p. 455; *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) For the second step, where, as here, the juvenile court has found that father failed to carry his burden to establish an exception to bypass, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law," that is, whether the evidence supporting father's position "was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300–301 (*Raul V.*).) We review a juvenile court's assessment of what is in the child's best interest for an abuse of discretion. (See *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

B.    *Analysis*

Father does not contest the juvenile court's findings that the bypass provisions under section 361.5, subdivisions (b)(5) and (b)(6) applied. Instead, he argues that the court should have found that he met his burden to establish the exceptions to bypass set forth in section 361.5, subdivision (c). We find no error.

11

With respect to section 361.5, subdivision (c)(3), father argues that there was sufficient evidence in the record to support a finding that reunification services were likely to prevent reabuse. However, he does not establish that the evidence compels a finding in his favor as a matter of law, nor could he on this record. Although father completed a parenting program and was appropriate during visitation with the twins, the court was also entitled to consider the severity of the injuries father inflicted non-accidentally on his two-month-old child and that father lied about the cause of those injuries for months, including to mother and to the healthcare providers treating Ai. In addition, almost immediately after the twins were removed from his care, father violated the court's orders by taking the children from mother. Father also engaged in several acts of domestic violence in the children's presence, including choking mother and attacking her car while the twins were inside. This evidence does not compel a finding that reunification services would prevent further similar conduct by father. (See *Raul V.*, *supra*, 82 Cal.App.5th at p. 301 [court was "not required to believe that the predisposition services had accomplished anything, let alone that further services would be more successful" in light of mother's failure to take responsibility for child's injuries].)

We reach the same conclusion regarding father's assertion that the evidence supports a finding that denial of reunification services would be detrimental to the children because of their attachment to him. (§ 361.5, subd. (c)(3).) His contention that the juvenile court should have weighed his positive visits with the twins more heavily than the severity of the abuse he inflicted on Ai. ignores the applicable standard. Given father's past behavior, "'[t]his is simply not a case where undisputed facts lead to only one conclusion'" in his favor. (*Raul V.*, *supra*, 82 Cal.App.5th at p. 302.)

12

The juvenile court was also entitled to weigh father's conduct in finding that reunification services would not be in the children's best interest. (§ 361.5, subd. (c)(2).) As we have discussed, the evidence supported the court's findings that father engaged in severe physical abuse of infant Ai., lied about it, then continued to engage in violent conduct directly putting the children at risk of harm. The court further found that this conduct, including a willingness to violate court orders, demonstrated a lack of insight and accountability by father and increased the risk of future harm to the children. (See *In re A.E.* (2019) 38 Cal.App.5th 1124, 1145 [finding "no evidence that reunification services could lead to adequate protection of the children and hence no evidence that reunification services would be in the children's best interest"].) We will not reweigh this evidence on appeal. (See, e.g., *In re I.B.* (2020) 53 Cal.App.5th 133, 156.) Father has therefore failed to demonstrate that the court abused its discretion in finding that reunification services were not in the children's best interests.

II. *ICWA*

Father contends DCFS failed its duty of inquiry under ICWA because it did not inquire with the twins' maternal grandparents about possible Native American ancestry. He points out that the maternal grandparents were known and available to DCFS, yet there is no indication in the record that DCFS asked them about their heritage. DCFS does not discuss the adequacy of its inquiry efforts. Instead, it argues that father's claim is premature. We agree that this claim is not ripe for review.

In a dependency proceeding, the child welfare agency and the court have "an affirmative and continuing duty to inquire" whether the child "is or may be an Indian child." (§ 224.2, subd. (a).) "[O]nce a child is placed into the temporary custody of a county welfare department, the duty to inquire

13

'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.'" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1132 (*Dezi C.*), quoting § 224.2, subd. (b).) "The operative concept is those people who are reasonably available to help [DCFS] with its investigation into whether the child has any potential Indian ancestry should be asked." (*Dezi C., supra,* 16 Cal.5th at p. 1140.) This inquiry duty continues throughout the dependency proceedings. (*Id*. at p. 1132.)

However, in an appeal from a disposition order in which the juvenile court has made no final ruling as to whether ICWA applies to the proceedings or whether DCFS has complied with the law's requirements, a challenge to the adequacy of the ICWA inquiry process is premature. (*J.J., supra,* 81 Cal.App.5th at p. 461; *In re S.H.* (2022) 82 Cal.App.5th 166, 179–180; *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 638–639.) In such cases, ICWA issues are not ripe for review "[b]ecause the dependency case is still ongoing," and therefore "any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings." (*J.J., supra,* 81 Cal.App.5th at p. 461.) Here, at the November 2024 detention hearing, the court found the matter was not governed by ICWA, but reminded DCFS "of its ongoing obligation to interview all known living relatives" and provide ongoing updates as to those inquiries. At the time it issued the challenged disposition order, the court had not made any further or final ICWA ruling and the case was ongoing. For this reason, "we decline [father's] invitation to assess the adequacy of the ICWA inquiry and noticing process that is, based on our assessment of the record, still ongoing as well." (*Ibid*., citing *In re M.R.* (2017) 7 Cal.App.5th 886, 904 [finding

ICWA claim premature where no final ICWA ruling made at dispositional hearing]; but see *In re Dominick D.* (2022) 82 Cal.App.5th 560, 563, 567 [affirming jurisdictional and dispositional findings, but vacating finding that ICWA does not apply for lack of evidence].)

Father contends that under *Dezi C., supra*, 16 Cal.5th at pages 1131–1132, DCFS's inadequate initial inquiry requires conditional reversal. *Dezi C.* is inapposite, as that case concerned an appeal from an order terminating parental rights. (*Id.* at p. 1125.) Here, father challenges the adequacy of DCFS's inquiry at an earlier stage of the proceedings. We decline to assess the adequacy of that ongoing process. (See *J.J., supra*, 81 Cal.App.5th at p. 461.)

However, we make no finding that DCFS has complied with its obligations under ICWA. We encourage DCFS to ensure full compliance with the law's requirements at these early stages in the proceedings, including by inquiring with available maternal relatives, to effectuate the purpose of ICWA and related California law. (See *Dezi C., supra*, 16 Cal.5th at p. 1140 ["'Although the duty of inquiry is a continuing one [citation], as we have seen in countless cases, ... if the inquiry is inadequate at the outset, the likelihood that the opportunity to gather relevant information will present itself later in the proceeding declines precipitously'"].) To the extent DCFS fails to do so, father may bring any deficiencies to the juvenile court's attention and, ultimately, raise the issue in a later appeal. (See *In re Baby Girl M., supra*, 83 Cal.App.5th at p. 638; *In re M.R., supra,* 7 Cal.App.5th at p. 904, fn. 9.) At this stage, however, the claim is premature.

DISPOSITION

The disposition order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COGLIATI, J.*

We concur:


ZUKIN, P. J.


TAMZARIAN, J.

---

*Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.